Julie DeVall McELROY, Appellee,

v.

STATE of Iowa and Iowa State University of Science and Technology, Appellants.

No. 03–1476.

Supreme Court of Iowa.

June 17, 2005.

Rehearing Denied Sept. 22, 2005.

Thomas J. Miller, Attorney General, and George A. Carroll, Assistant Attorney General, for appellants.

Paige Fiedler of Fiedler, Townsend & Newkirk, P.L.C., Johnston, and Roxanne Barton Conlin of Roxanne Conlin & Associates, P.C., Des Moines, for appellee.

STREIT, Justice.

This court is hip deep in issues. Together the parties in this sexual harassment case have appealed the district court's rulings on nearly *thirty* grounds. Because the plaintiff failed to exhaust her administrative remedies on her retaliation-in-employment claim, we reverse and remand for a new trial. At that trial, the plaintiff shall have the right to have her state law claims tried to a jury.

## I. Facts and Prior Proceedings

In 1994, Julie McElroy enrolled as a graduate student in the doctoral program at the Iowa State University College of Education. Lynn Glass, a male professor in the College, was McElroy's academic advisor. ISU also hired McElroy to work as a research assistant for Glass. Glass taught at least one of McElroy's classes.

Glass repeatedly subjected McElroy to unwelcome touching and grossly inappropriate comments. The harassment reached its zenith (or nadir) in April 1995 when ISU sent McElroy to Russia to help Glass run a month-long cultural and educational exchange program for high school students.

Upon arrival at their hotel in Russia, McElroy discovered Glass had arranged for them to share a two-room suite—with both beds in one room. McElroy told Glass she was uncomfortable with the sleeping arrangements and insisted one of the beds be moved to the other room. Glass became furious but eventually relented.

Glass later publicly berated McElroy for not letting him "take care" of her on their first night at the hotel. He told her she

could "kiss her Ph.D. good-bye." While the two were riding the Moscow Metro, he threatened to leave her alone and let her find her way home. This was particularly troublesome because Glass had taken McElroy's passport and money "for safe-keeping" after they had deplaned.

At other times on the trip, Glass gave McElroy a massage after she told him not to do so; rubbed lotion on her feet against her will in a manner that evoked images of sexual intercourse; told her intimate details about his sex life, including a disgustingly detailed description of his semen; kissed her after she told him not to touch her; and ran suddenly into her room and told her he had just "messed himself." We need not repeat all the salacious facts here; nonetheless we remain fully cognizant of them.

Shortly after returning home from Russia, McElroy made a sexual harassment complaint to Ann Thompson, a department chair in the College. Thompson notified Noreen Daly, Dean of the College. For the most part, Glass fessed up to his actions. Thompson removed Glass from his position as McElroy's academic advisor and instructor. Thompson also reassigned McElroy to work as a graduate assistant for another professor. Thompson and Daly told Glass to have no contact with McElroy.

Glass continued to pester McElroy. In June 1995, McElroy filed a formal complaint with the ISU Affirmative Action Office. McElroy was frustrated that ISU was not taking adequate steps to stop Glass from harassing her. She also voiced concern that ISU would retaliate against her. ISU appointed an attorney, Jeanne Johnson, to investigate.

Johnson concluded Glass had violated ISU's sexual harassment policy, created a hostile work environment, and interfered with McElroy's academic progress. Johnson recommended ISU eliminate interaction between Glass and McElroy, conduct sexual harassment training, and suspend Glass without pay for one semester. Dean Daly adopted Johnson's recommendations but increased the term of the suspension to one year. ISU's president tried to fire Glass, but dropped the formal proceedings necessary to dismiss a tenured faculty member after Glass was diagnosed with terminal colon cancer. Glass died in May 1997.

In November 1997, McElroy sued the State of Iowa and ISU (the defendants) for sexual harassment in employment and education, in violation of various federal and state statutes. McElroy maintained the defendants did not adequately address Glass's behavior. Instead of protecting her from Glass when she complained, McElroy alleged the defendants retaliated by changing the terms of her employment. McElroy claimed she suffered psychologically and physically as a result. She dropped out of the graduate program on December 31, 1997.

McElroy initially lost at trial, but we reversed on account of a confusing jury instruction. *See generally McElroy v. State,* 637 N.W.2d 488 (Iowa 2001) [*McElroy I* ]. On remand, McElroy won. A jury awarded her over $3 million in damages on her federal claims, including approximately $2.5 million for emotional distress. Although the court also found a violation of state law, it ruled most of her state law damages were subsumed within her federal law damages. The defendants appealed and McElroy cross-appealed. We consolidated all appeals.

Additional facts will be set forth below. We first consider the appeal issues, then the cross-appeal issues.

## II. The Merits: The Appeal

The defendants ostensibly raise nine issues for our review on appeal, but some of

these have as many as eleven sub-issues. We examine these arguments in turn, to the extent necessary.

### A. Scope of Retrial

■ The defendants contend the district court erred when it granted a retrial of all the issues in the case. The defendants posit *McElroy I* only required retrial of McElroy's *employment discrimination* claim because the erroneous jury instruction involved solely that claim. They argue employment discrimination is distinct from retaliation and education discrimination. The parties agree our review is for errors at law.

■ The general rule is that when a new trial is granted, all issues must be retried. *See, e.g., Hawkeye Bank v. State*, 515 N.W.2d 348, 353 (Iowa 1994); *Sauer v. Scott*, 176 N.W.2d 140, 147 (Iowa 1970); *Larimer v. Platte*, 243 Iowa 1167, 1175–76, 53 N.W.2d 262, 267 (1952); *Woodward v. Horst*, 10 Iowa 120, 123 (1859); *see also* 5 C.J.S. *Appeal & Error* § 947 (1993).

> [T]he granting of partial new trials is a practice not to be commended. .... As a condition to the granting of a partial new trial, it should appear that the issue to be tried is distinct and separable from the other issues, and that the new trial can be had without danger of complications with other matters.... Nor may [only] certain issues be retried unless it appears that the other issues have been rightly settled and injustice will not be occasioned.

*Larimer*, 243 Iowa at 1176–77, 53 N.W.2d at 267–68 (citations and internal quotations omitted); *accord Woodward*, 10 Iowa at 123 (holding partial retrial warranted if convenient, nonprejudicial, and "not attended with too much confusion"). On occasion we have limited retrial to certain issues, but when we have done so we have said so. *See, e.g., Dailey v. Holiday Dis-*

*trib. Corp.*, 260 Iowa 859, 877, 151 N.W.2d 477, 489 (1967); *McCarville v. Ream*, 247 Iowa 1, 10–14, 72 N.W.2d 476, 481–83 (1955); *Woodward*, 10 Iowa at 124.

We did not limit the scope of the retrial in *McElroy I*. The record before us shows McElroy requested retrial of all claims in that appeal. Finding reversible error with respect to one of those claims, we ordered a new trial. *McElroy I*, 637 N.W.2d at 502. We did so without qualification. *Id.*

### B. Exhaustion of Administrative Remedies

■ In the district court, the defendants objected to the trial of McElroy's retaliation claims because she had not exhausted her administrative remedies. Specifically, the defendants claimed McElroy had only notified the Equal Employment Opportunity Commission (EEOC) and Iowa Civil Rights Commission (ICRC) about her federal and state sex discrimination claims, not her retaliation claims. We consider the federal and state claims separately.

#### 1. Title VII

■ Title VII explicitly prohibits both sex discrimination and retaliation. *See* 42 U.S.C. § 2000e *et seq.*

> However, Title VII establishes an administrative procedure which a complaining employee must follow.... Exhaustion of administrative remedies is central to Title VII's statutory scheme because it provides the [administrative agency] the first opportunity to investigate discriminatory practices and enables it to perform its roles of obtaining voluntary compliance and promoting conciliatory efforts.

*Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir.1994) (citations omitted). Exhaustion of administrative remedies under Title VII requires

a claimant to give notice of all claims in the initial administrative complaint. *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 630–31 (8th Cir.2000).

McElroy filed her complaint with the ICRC on March 14, 1997. (The same complaint was cross-filed with the EEOC). She used the standard form, which requires complainants to identify the bases of their harassment claims by checking the applicable boxes. McElroy checked the box labeled "sex" but not the "retaliation" box.[1] When the ICRC asked McElroy to state in narrative fashion why she felt she was discriminated against, McElroy described Glass's continuing harassment. Although she indicated the defendants were not adequately addressing this ongoing harassment, she did not describe any acts of retaliation. Indeed, the reviewing officer specifically noted that "the only issue is whether [the defendants] took reasonable measures to stop the harassment and keep [McElroy] from working in a hostile environment." Because McElroy did not allege retaliation, she therefore failed to exhaust her Title VII remedies with respect to alleged retaliation-in-employment. *See Williams*, 21 F.3d at 222–23 (arriving at similar conclusion on analogous facts; holding plaintiff not entitled to pursue sexual discrimination claim because she did not check "sex" box and confined her narrative discussion to retaliation).

▪ It is true the administrative complaint must be construed liberally to further the remedial purpose of the civil rights laws. *Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 886–87 (8th Cir.1998). For this reason, in spite of the foregoing discussion "[a] plaintiff will be deemed to have exhausted administrative remedies as to allegations contained in a judicial complaint that are like or reasonably related to the substance of charges timely brought before [the administrative agency]." *Williams*, 21 F.3d at 222. Allegations that are not so related must be dismissed, however, because allowing a plaintiff to pursue them in court would circumvent the statutory scheme which requires the use of administrative proceedings. *See Duncan v. Delta Consol. Indus., Inc.*, 371 F.3d 1020, 1025 (8th Cir.2004).

▪ Although at first glance one might think sex discrimination and attendant retaliation are "reasonably related," "it is well established that retaliation claims are not reasonably related to underlying discrimination claims." *Wallin v. Minn. Dep't of Corrections*, 153 F.3d 681, 688 (8th Cir.1998); *see also Duncan*, 371 F.3d at 1025; *Russell v. TG Missouri Corp.*, 340 F.3d 735, 747–48 (8th Cir.2003); *Graham v. Bryce Corp.*, 348 F.Supp.2d 1038, 1042 (E.D.Ark.2004); *Nichols v. ABB DE, Inc.*, 324 F.Supp.2d 1036, 1045 (E.D.Mo.2004); *Price v. Harrah's Maryland Heights Operating Co.*, 117 F.Supp.2d 919, 922 (E.D.Mo.2000); *Fry v. Holmes Freight Lines, Inc.*, 72 F.Supp.2d 1074, 1079 (W.D.Mo.1999). An exception, however, applies when the retaliation alleged in the subsequent lawsuit was clearly *the result of the filing of the administrative complaint*. *See Wallin*, 153 F.3d at 689; *accord Wentz v. Maryland Cas. Co.*, 869 F.2d 1153, 1154 (8th Cir.1989) (retaliation claim could be considered because it "grew out of the discrimination charge" the plaintiff filed). The timing of the retaliation is crucial in this analysis: if the alleged retaliation began before the filing of the administrative complaint, a subsequent suit for retaliation that was not brought to the attention of the administrative agency is barred. *See Wallin*, 153 F.3d at 689.

---

1. The form states the retaliation box applies if the complainant thinks the discrimination occurred "[b]ecause I filed a prior complaint or opposed a discriminatory practice."

At trial, the thrust of McElroy's retaliation claim centered around the fact that after she complained to the ISU Affirmative Action Office, in 1996 she was demoted from a temporary instructor to a graduate assistant. (The former position paid significantly more and did not require McElroy to take classes.) She also alleged her letters-of-intent were delayed. Because McElroy did not file her complaint with the ICRC until March 1997 and did not allege retaliation in it even though the alleged retaliation had begun the year before, the district court should not have allowed a Title VII retaliation claim based on the prior allegations. *See Williams*, 21 F.3d at 222–23 (arriving at same conclusion on similar facts); *see also Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 760 (8th Cir.2004) (finding failure to exhaust administrative remedies where complainant did not check retaliation box and did not allege any facts in complaint to administrative agency to show retaliation); *Duncan*, 371 F.3d at 1025–26 (similar to *Williams* and holding same); *Watson v. O'Neill*, 365 F.3d 609, 614 (8th Cir.2004) (similar); *Russell*, 340 F.3d at 748 (holding plaintiff failed to exhaust administrative remedies as to retaliation claim because retaliation began before administrative charge was filed and therefore could not

be said to "grow out of" it); *Graham*, 348 F.Supp.2d at 1042 (similar); *Nichols*, 324 F.Supp.2d at 1045; *Price*, 117 F.Supp.2d at 922; *Fry*, 72 F.Supp.2d at 1079.[2]

## 2. ICRA

 Although the authorities cited in the foregoing analysis only apply to McElroy's Title VII claim, we think—at least on the arguments presented in this case—that the same analysis should be applied to McElroy's retaliation claim brought under the ICRA. Because the ICRA is in part modeled after Title VII, we have traditionally looked to federal law for guidance in interpreting it. *Pecenka v. Fareway Stores, Inc.*, 672 N.W.2d 800, 803 (Iowa 2003). McElroy has not argued that we should apply a different analysis to the ICRA. Therefore we decline to forge new ground in the absence of briefing. *See Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 6 (Iowa 2004) ("[I]t is prudent to delay any consideration of whether a different analysis is appropriate to a case in which this issue was thoroughly briefed and explored."); *see also Pecenka*, 672 N.W.2d at 803 (noting that despite consistent utilization of the federal analytical framework, Iowa courts are not bound by federal law in interpreting the ICRA).[3]

**2.** A recent United States Supreme Court decision buttresses our conclusion, and may even render the "reasonably related" exception obsolete. In *National Railroad Passenger Corp. v. Morgan*, which the parties do not discuss, the Court concluded that each discrete retaliatory action constitutes its own unlawful employment practice for which administrative remedies must be exhausted. 536 U.S. 101, 110–113, 122 S.Ct. 2061, 2070–72, 153 L.Ed.2d 106, 120–22 (2002); *see also Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 741 (Iowa 2003) (discussing *Morgan* and applying it to the ICRC continuing violation doctrine). At least one federal circuit court of appeals has abandoned the "reasonably related" exception af-

ter *Morgan*. *See Annett v. Univ. of Kansas*, 371 F.3d 1233, 1238 (10th Cir.2004).

**3.** As an aside, we note that *Lynch v. City of Des Moines*, 454 N.W.2d 827 (Iowa 1990), is inapposite to the case at bar. In *Lynch* we held, *consistent with federal authority*, that a retaliation claim based upon retaliatory conduct that began shortly *after* the filing of a sex discrimination complaint with the ICRC was properly before the district court. 454 N.W.2d at 833. *But see Reiss v. ICI Seeds, Inc.*, 548 N.W.2d 170, 173–74 (Iowa Ct.App. 1996) (deviating, *sub silentio*, from federal analysis and holding plaintiff exhausted administrative remedies under the ICRA with respect to sex discrimination claim even though she only presented retaliation claim to

### 3. Disposition

 Because the district court erroneously allowed a Title VII retaliation-in-employment claim, we are obliged to reverse and remand for a new trial on all issues. Although the jury also found the defendants had violated Title VII for discrimination-in-employment, the special verdict form did not distinguish damages for retaliation; instead it lumped all damages together. We are unable therefore to divine which damages should be attributed to which acts.[4]

### C. Remaining Appeal Issues

The defendants also argue the district court erred in a number of other respects, including eleven allegedly faulty jury instructions. Because we have already decided a new trial is necessary, we do not reach these other issues. We pause briefly to consider one of the jury instructions because it is likely to arise again on retrial. *See McElroy I*, 637 N.W.2d at 501–02 (similarly considering evidentiary matters); *see also Gacke v. Pork Xtra, L.L.C.*, 684 N.W.2d 168, 184–85 (Iowa 2004); *Greenwood v. Mitchell*, 621 N.W.2d 200, 207–08 (Iowa 2001).

***Instruction No. 40***

 Instruction No. 40 stated that "[a]ny damages awarded to the plaintiff are treated as taxable income." It is uncertain how the jury was to use this instruction. In *Stover v. Lakeland Square*

*Owners Ass'n*, 434 N.W.2d 866, 871 (Iowa 1989), we affirmed the district court's refusal to give an instruction that pointed out that a personal-injury award was *not* taxable. Although *Stover* is not precisely on point, its reasoning applies with equal force in this case. We stated:

> [T]he drawbacks of such an instruction seem to outweigh its benefits. Especially here, where the parties offered no evidence concerning taxation at trial, the possibility for confusion, speculation, and conjecture would be great.

*Stover*, 434 N.W.2d at 871. Likewise, in the case at bar the parties did not offer any evidence concerning the taxable consequences of an award. The jury was left to speculate. One can only imagine the questions the members of the jury might ask:

> Should we up our award to McElroy because her award is taxable? How much in taxes would McElroy have to pay? What tax bracket does she fall in? Don't her lawyers get a cut? What do we do?

This is precisely what we were concerned about in *Stover*, when we declined to open a "Pandora's Box" of cautionary instructions to the jury. *Id.* The risk of confusion, speculation, and conjecture is simply too great. *See id.* Not only do such instructions invite speculation, but they also unduly draw attention to a collateral consequence of a jury award and thereby constitute an unfair comment. *See id.*[5];

---

the ICRC because they had common elements and were therefore necessarily "reasonably related"; in *Reiss* the court of appeals did not address or discuss the long line of Title VII cases holding to the contrary).

4. The foregoing discussion of exhaustion of administrative remedies only applies to McElroy's allegations of retaliation-in-employment in violation of Title VII and the ICRA. Title IX claimants are not required to exhaust the Title VII administrative scheme. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 706–08 n. 41,

99 S.Ct. 1946, 1962–63 n. 41, 60 L.Ed.2d 560, 581–82 n. 41 (1979); *see also Frederick v. Simpson Coll.*, 160 F.Supp.2d 1033, 1035 (S.D. Iowa 2001) ("*Cannon* ... made clear that private suits to enforce Title IX can be brought without exhausting administrative remedies.").

5. So far as we can tell, the Supreme Court has not ruled to the contrary with respect to Title VII claims. It is true that in *Norfolk W. Ry. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), the Supreme Court held

*see also Anderson v. Webster City Cmty. Sch. Dist.*, 620 N.W.2d 263, 268 (Iowa 2000) (noting reversal warranted "when the trial court's instruction materially misstates the law, confuses or misleads the jury, or is unduly emphasized"). The tax consequences instruction should not be given.

## III. The Merits: The Cross–Appeal

 McElroy raises a number of issues on cross-appeal, but we choose to address only one because it alone will undoubtedly reoccur on remand and involves an issue of substantial public importance. *Cf. McElroy I*, 637 N.W.2d at 501–02 (considering evidentiary issues). McElroy urges us to overrule *Smith v. ADM Feed Corp.*, 456 N.W.2d 378 (Iowa 1990), and hold plaintiffs under the ICRA are entitled to have their claims tried to a jury of their peers.

### A. *Smith*

In *Smith*, a sharply divided court held there was no right to a jury trial under the ICRA. The case at bar apparently presents the first opportunity to reexamine *Smith*. Two plaintiffs have asked the court of appeals to "overrule" *Smith*, but understandably that court has declined to tinker with our precedents. *Reiss v. ICI Seeds, Inc.*, 548 N.W.2d 170, 175 (Iowa Ct.App.1996); *Ramirez v. Iowa Dep't of*

it was reversible error for the trial court in a FELA case to refuse a defendant's instruction that an award would *not* be taxable. (In *Stover*, we expressly declined to follow *Norfolk* as a matter of state law.) With respect to Title VII, however, *Norfolk* is distinguishable. The policy behind issuing such an instruction on the taxable consequences of a FELA award in *Norfolk* is not present here.

In *Norfolk*, the Supreme Court was concerned that juries likely presumed awards were taxable and might therefore *overcompensate* plaintiffs unless an instruction was given that an award would *not* be taxable. Here,

*Transp.*, 546 N.W.2d 629, 632 (Iowa Ct. App.1996).

In its statutory analysis, the majority in *Smith* concluded the district court in an ICRA action "sits as the [ICRC] and is empowered only to grant that relief authorized" by the ICRA. 456 N.W.2d at 381. The majority stressed the administrative nature of the ICRA framework and concluded that affording a jury trial in district court "would substantially interfere with a statutory scheme which delegates to the court only that limited power held by the commission." *Id.* Concerned that ruling to the contrary would result in a time consuming process which would place "a greater emphasis ... on a money recovery over other available relief," the majority concluded the statute should not be interpreted to afford litigants a jury trial. *Id.* The majority also noted that the statute itself did not say whether a jury trial was afforded, and considered this silence as evidence the legislature did not intend a jury trial. *Id.* at 380–81.

### B. Examination of *Smith*

On further examination, we conclude the majority's statutory analysis in *Smith* was fundamentally flawed and must be overruled. As four members of this court pointed out in *Smith*, the majority erred when it concluded the ICRA framework was administrative in nature:

however, McElroy apparently seeks a windfall by encouraging the jury to return an award that negates her tax obligations. There is no announced Congressional policy that a plaintiff should be compensated at such a level so as to relieve her of her tax burden; indeed, federal policy as currently reflected in federal tax law expressly points to the contrary. Not only does the instruction in this case impermissibly cause the jury to speculate about possible tax consequences, but it also unduly draws attention to a fact in order to prod the jury to make an award contrary to legislative intent.

The district court does *not* sit as a civil rights commission; it does not screen cases as does the commission; it does not investigate cases like the commission; nor does a court hear cases under the commission's rules. When the legislature sought to provide a partial answer to the backlog of undisposed claims before the civil rights commission, it did so by providing an *alternative* to the administrative proceeding in the form of an ordinary civil action.

*Id.* at 387–88 (Carter, J., dissenting) (emphasis in original). While it is true the ICRA generally requires plaintiffs to exhaust their administrative remedies, there is nothing extraordinary about the nature of a district court proceeding brought once those remedies are so exhausted. The ICRA is no different than any other statute providing a cause of action. The ICRA has always permitted a plaintiff to sue for monetary damages in the district court. For this reason, it is not surprising the legislature did not expressly indicate claimants were entitled to a jury trial under the ICRA—it was assumed.

Far from "substantially interfere[ing] with [the] statutory scheme," interpreting the ICRA framework as written would alleviate the problems that have arisen since *Smith* was decided. In *Smith,* the dissent pointed out that denying the right to a jury trial on ICRA claims would not only run contrary to legislative intent, but would also prove infelicitous because plaintiffs bringing several different causes of action would have some of them tried by a jury, with others tried to the court. *Id.* at

388. Fifteen years later, the dissent's prophesy has come true.

Further problems have arisen. Shortly after *Smith* was decided, Congress passed legislation that granted litigants the right to a jury trial under Title VII. *See* 42 U.S.C. § 1981.[6] Subsequently, the Eighth Circuit ruled it was not bound to our pronouncement in *Smith.* *See Pickens v. Soo Line R.R.,* 264 F.3d 773, 779 (8th Cir. 2001). Federal district courts in Iowa have ruled litigants have a right to a jury trial on their ICRA claims in federal court. *See, e.g., Bales v. Wal–Mart Stores, Inc.,* 972 F.Supp. 483, 490 (S.D.Iowa 1997) (concluding "[t]he ICRA authorizes actual damages, as well as equitable remedies" and granting jury trial on ICRA claim). As McElroy points out, this has resulted in the odd situation that plaintiffs bringing ICRA claims in federal court may receive a jury trial, but those in state court will not.[7] This has only further compounded the problems the dissent foretold.

■■■■■ In truth, there is only one reason to uphold Smith today—*stare decisis.* "From the very beginnings of this court, we have guarded the venerable doctrine of stare decisis and required the highest possible showing that a precedent should be overruled before taking such a step." *Kiesau v. Bantz,* 686 N.W.2d 164, 180 n. 1 (Iowa 2004) (Cady, J., dissenting) (citing, in part, *Hildreth v. Tomlinson,* 2 Greene 360, 361 (Iowa 1849)). We do not overturn our precedents lightly and will not do so absent a showing the prior decision was clearly erroneous. *See, e.g., Kersten Co. v. Dep't of Soc. Servs.,* 207 N.W.2d 117, 121

---

**6.** Any analogy in *Smith* to a pre-jury trial Title VII is not only outdated, but also mistaken. As the dissent pointed out, unlike the ICRA, *Smith* was decided at the time Title VII only granted equitable relief.

**7.** This dichotomy is not unique to Iowa, however. *See DiCentes v. Michaud,* 719 A.2d 509,

513 n. 6 (Me.1998) (noting state and federal courts in Maine, Iowa, Missouri, and Pennsylvania are so split). *But see State ex rel. Diehl v. O'Malley,* 95 S.W.3d 82 (Mo.2003) (overruling prior precedent and granting right to jury trial under state constitution and thereby ending the split with federal courts in Missouri).

(Iowa 1973); *Doolittle v. Shelton*, 1 Greene 272, 273 (Iowa 1848); *accord Miller v. Westfield Ins. Co.*, 606 N.W.2d 301, 306 (Iowa 2000) ("when error is manifest"); *Cover v. Craemer*, 258 Iowa 29, 35, 137 N.W.2d 595, 599 (1965) ("palpably wrong"); *Stuart v. Pilgrim*, 247 Iowa 709, 714, 74 N.W.2d 212, 216 (1956) ("only for the most cogent reasons"); *Lammars v. Chi. Great W. R.R.*, 162 Iowa 211, 215, 143 N.W. 1097, 1098 (1913) ("weighty and sufficient reasons"). This is especially true in this case because we often infer legislative assent to our precedents from prolonged legislative silence. *See, e.g., State v. Anderson*, 517 N.W.2d 208, 215 (Iowa 1994); *Gen. Mortgage Corp. v. Campbell*, 258 Iowa 143, 152, 138 N.W.2d 416, 421 (1965). These principles are not absolute, however.

 "[S]tare decisis does not prevent the court from reconsidering, repairing, correcting or abandoning past judicial announcements when error is manifest, including error in the interpretation of statutory enactments." *Miller*, 606 N.W.2d at 306. Stare decisis "should not be invoked to maintain a clearly erroneous result." *Id.* (quoting *Kersten*, 207 N.W.2d at 121).

> [W]hen a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment.

Benjamin N. Cardozo, *The Nature of the Judicial Process* 150 (1921); *see, e.g., State v. Liddell*, 672 N.W.2d 805, 813 (Iowa 2003). As for the legislative-assent-from-silence argument, it should be noted that the majority in *Smith* ignored this very principle. The dissent in *Smith* correctly noted that in several cases before that case was decided claimants *were* afforded a jury trial under the ICRA. Indeed, historically Iowans were afforded the right to a jury trial under previous civil rights statutes. *Smith*, 456 N.W.2d at 388 (Carter, J., dissenting) (citing *Ayala v. Center Line, Inc.*, 415 N.W.2d 603 (Iowa 1987); *Annear v. State*, 454 N.W.2d 869 (Iowa 1990)). Rather than attempt to divine legislative intent in this fashion, we must remember that legislation sometimes persists on account of "inattention and default rather than by any conscious and collective decision." Ronald Dworkin, *Law's Empire* 319 (1986).

For all the foregoing reasons, we overrule *Smith* and hold a plaintiff seeking money damages under the ICRA is entitled to a jury trial.

## IV. Disposition

McElroy failed to exhaust her administrative remedies with respect to her federal and state retaliation-in-employment claims. Therefore these claims were not properly before the district court. Because the jury returned a general verdict, a new trial is required on all surviving claims. On remand, the plaintiff shall have the right to have her entire case tried to a jury.

**REVERSED AND REMANDED.**

All justices concur except WIGGINS, J., who takes no part.